IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COURTNEY GATTER,** <br>         **Plaintiff,** <br><br> v. <br><br> **IKA-WORKS, INC.,** <br>         **Defendant.** | CIVIL ACTION <br><br><br><br><br> NO.  16-953 |

## OPINION

Plaintiff Courtney Gatter brings this employment discrimination claim against her former employer, Defendant IKA-Works, Inc., alleging that the atmosphere created during a company-sponsored sailing trip in the Mediterranean Sea constituted a hostile work environment, and that her termination following that trip was discrimination based on her sex.  Plaintiff brings her claims under both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 *et seq*.  Defendant now seeks summary judgment on all claims.  Defendant's motion shall be granted with respect to any retaliation claims included in this case, but shall be denied in all other respects.[1]

**I.    BACKGROUND**

    **A.   Plaintiff's Employment with IKA-Works**

Plaintiff Courtney Gatter was hired by Defendant IKA-Works, Inc. ("IKA-Works") as an outside sales representative in March 2014.  Plaintiff worked remotely from her home in West Chester, Pennsylvania, and was supervised by Managing Director Refika Bilgic ("Bilgic") from IKA-Works' headquarters in Wilmington, North Carolina.  She consistently received positive evaluations regarding her sales performance.

---

[1] In response to Defendant's motion for summary judgment, Plaintiff conceded that there is no factual basis for a retaliation claim, and to the extent that such a claim appears in the Complaint, Plaintiff does not oppose summary judgment.

1

IKA-Works is the wholly-owned U.S. subsidiary of IKA Werke, GmbH & Co., KG ("IKA Werke"), a German manufacturer of products for the chemical, pharmaceutical, and food industries. IKA Werke is owned entirely by the Stiegelmann family. In 2014, René Stiegelmann ("René") served as 20% owner and as President, with his sons Marcel Stiegelmann ("Marcel") and Pascal Stiegelmann ("Pascal") each owning 30% and his late mother Gudrun Stiegelmann ("Gudrun") owning the remaining 20%.[2] Marcel and Pascal are adults, but they are not permitted to withdraw funds from their IKA share accounts without permission from René (and Gudrun prior to her death). In 2014, Marcel was not employed by any IKA-affiliated entity, although he served in a brief internship at IKA Werke in a prior year for which he was paid the standard intern salary. Although René formally serves as president, decisions regarding the IKA entities are made collectively by a Family Council, which, in 2014, consisted of René, Marcel, Pascal, Gudrun, and Bilgic (who has been René's romantic partner since 2011).

### B. Sailing Trip

In August 2014, Plaintiff – along with other IKA-Works sale representatives – was invited on a sailing trip to the Balearic Islands to recognize recent sales efforts. The trip plan called for the sales representatives, as well as Bilgic, René, Marcel, and Pascal to meet in Majorca before embarking on a sailing journey to Ibiza and Formentera, and then returning to Majorca for two days of business meetings at René's beach house.

#### 1. Plaintiff's Pre-Trip Concerns

Prior to the trip, Plaintiff had concerns about the history of intermingling business with personal and romantic relationships within the IKA entities. Specifically, René had previous romantic relationships with three female employees at either IKA Werke or IKA-Works –

---

[2] Gudrun Stiegelmann passed away in early 2016, and her shares were divided evenly between Marcel and Pascal who now each own 40% of IKA Werke.

2

including Marcel and Pascal's mother – before beginning his relationship with Bilgic in 2011 (one year after she became managing director of IKA-Works). Plaintiff had also heard rumors during her initial training that Bilgic had previously terminated female employees who she perceived as a threat to her relationship with René. Plaintiff did not voice her concerns to any IKA-Works employees, however, and she agreed to attend the trip.

### 2. Events During the Trip

The trip participants arrived separately to Majorca on August 30, 2014 and were divided between two boats – the Blue Bird and the Southern Sunset. Marcel and Pascal were designated as captains of the respective boats, based on their sailing experience. Marcel, Plaintiff, René, Bilgic, and two other male IKA-Works employees were assigned to the Blue Bird.[3] Bilgic spent daytime hours on the Southern Sunset to assist Pascal, however, leaving Plaintiff as the only female passenger on the Blue Bird during the day. Each boat had four bedrooms, and each bedroom had a corresponding shower that opened into a common room. On the Blue Bird, Plaintiff and the male IKA-Works employees were each assigned their own rooms, René and Bilgic shared a room, and Marcel planned to sleep on the deck of the boat.

#### a. Plaintiff and Marcel Engage in a Relationship

Plaintiff and Marcel had never met before the sailing trip and interacted very little during the first two days. The first time Marcel recalls spending time with Plaintiff was on the third day of the trip as the group gathered to watch a flamenco dancer in the marina at Formentera. Later that night, a mechanical problem caused a strong odor to hover over the boats. After Marcel complained that the smell made it difficult to sleep on the deck, Plaintiff invited him to sleep in her room. It is undisputed that Marcel did not specifically ask to sleep in Plaintiff's room,

---

[3] The boat assignments were made via a random drawing, although one female employee was switched from the Blue Bird to the Southern Sunset at her own request.

although she claims that he "made it very apparent" that he wanted to do so. Once Marcel had relocated to Plaintiff's room, they talked for 15 to 20 minutes before kissing. Plaintiff claims that Marcel suggested sexual intercourse, but Plaintiff rejected his advance and told him that it was "not a good idea on a work trip on a sailboat." Plaintiff later recalled feeling unsure of how to proceed, given the rumors she had heard about the company, and that she felt "damned if [she] did, and damned if [she] didn't" accept Marcel's advances. Marcel then suggested that they take a walk on the beach, which they did – passing and conversing with René as they left the boat. While on the beach, Plaintiff and Marcel engaged in sexual activity. They then returned to the boat and spent the night together in Plaintiff's room.

The following day, René and Bilgic found out about Plaintiff and Marcel's sexual encounter from Pascal. René was immediately upset and asked Marcel why he would engage in sexual activity with a relatively new employee on a business trip. Marcel recalls that Bilgic did not seem troubled when he later spoke to her about the encounter (although she seemed "surprised"), but Bilgic claims that she was immediately upset about the relationship and felt that it was inappropriate for a new employee (who had a boyfriend that Bilgic had recently met) to be "hooking up" with Marcel during a company trip. Bilgic recalls suggesting to René that both Plaintiff and Marcel be sent home and that the company contact a lawyer. René rejected both ideas because he did not want to "ruin the trip."

Neither René nor Bilgic reached out to Plaintiff to discuss the situation. On the last day in Formentera, however, Plaintiff approached Bilgic. Plaintiff claims that Bilgic "squealed with delight" at the news that Plaintiff and Marcel had a connection, although she warned Plaintiff not to spend too much time with Marcel during the trip. Bilgic recalls this conversation quite

4

differently. As she remembers it, Plaintiff came to her to apologize. Bilgic accepted the apology and reassured Plaintiff that she would be judged by her sales numbers.

Plaintiff and Marcel's relationship continued after the group returned to Majorca. By this time, Plaintiff and Marcel were both aware of René's disapproval, although Plaintiff maintains that Bilgic was still supportive, pointing to the fact that Bilgic text messaged Plaintiff to inform her that she had given Plaintiff's phone number to Marcel, followed by a winking emoji. The next day, the Family Council met and extensively discussed how to respond to the relationship between Plaintiff and Marcel. They considered several options, including terminating Plaintiff's employment or sending both Marcel and Plaintiff home, but the Council ultimately decided not to take any action.

On the final day of the trip, Plaintiff approached Bilgic and René and asked to speak with them privately about her relationship with Marcel. They proceeded to René's patio and left the rest of the group inside the house. According to Bilgic and René, Plaintiff apologized and acknowledged that she had behaved unprofessionally on the trip. Plaintiff agrees that she apologized for "having sex on a business trip," but denies making a broader apology about the relationship. René then asked Bilgic to leave so that he could speak to Plaintiff "as Marcel's father."

Once he was alone with Plaintiff, René recalls asking her, "How can a woman like you, a professional businesswoman, let something like this happen. How can you spread your legs after the second day, after the third day or whenever it happened? I mean if this happened after three months or – what kind of sign is this?" He then gave Plaintiff an ultimatum: quit working for IKA-Works to pursue a relationship with Marcel, or break things off with Marcel and continue in her sales position at IKA-Works. René says that Plaintiff agreed to end her relationship with

Marcel without hesitation.  René then suggested they hug each other and encouraged Plaintiff not to cry.

Plaintiff recalls the private conversation with René differently.  While she agrees that he asked her how she could "open her legs," she also maintains that he called her a "whore," asked her how she could "let" Marcel "f---" her, and indicated that the company could no longer respect her.  She remembers René adding that sleeping with his son was not a way into the family.[4]  Plaintiff does not know if any other employees heard the conversation, although she assumed at the time that they could.  After the conversation, Plaintiff left through the house, avoiding eye contact with the group, and walked back to her hotel by herself.  Once back at the hotel, Plaintiff called her mother and expressed a fear that she would be fired immediately and that IKA-Works would not pay for her return to the United States.  Plaintiff also texted Marcel that "it's best if we just leave what happened here in Spain."

That evening at the final dinner, Plaintiff sat directly across from René.  She recalls that he glared at her throughout dinner, but did not speak with her – which she perceived as intentional isolation.  After dinner, Plaintiff spoke with Bilgic who she claims told her that the events of the trip would not be held against her and that Plaintiff should reach out to her once they returned to the United States.  Later that night, Marcel came to visit Plaintiff outside her hotel room.  Marcel told her that he did not want the relationship to end, but Plaintiff indicated that she could not keep it going.  Plaintiff and Marcel have not seen each other since.

### b.  Alleged Harassment by René

Plaintiff's hostile work environment claim is based not only on Marcel's sexual advances and René's discussion with her on the patio, but also on the allegations that René took an

---

[4] In the course of their text message conversations, Plaintiff had asked Marcel about his future with IKA Werke. René knew about this exchange, and, accordingly to Bilgic, this triggered René's sensitivity about outsiders attempting to join the Stiegelmann family.

6

inappropriate picture of Plaintiff and exposed himself to her on two occasions. With respect to the picture, Plaintiff has identified a photograph that René took of Marcel (shirtless and seated at the captain's position) and Plaintiff (fully clothed and reclining on the deck), which Plaintiff sees as looking "right up her shorts." That photograph was taken on the first day of the trip (*i.e.*, the first time that Plaintiff and Marcel met), and was one of several that René took of Marcel and Plaintiff as he reportedly remarked that they would want to remember that day together.

Plaintiff further states that René exposed himself to her on two occasions. The first occurred in the common room below the deck of the Blue Bird. While the boat was docked at Formentera, Plaintiff descended from the deck into the common room and saw René in the nude toweling himself off after a shower. She immediately apologized, turned around, and returned to the deck. René denies that he was exposed to Plaintiff on this occasion. The second incident occurred during a scooter trip on Formentera. The group stopped at a beach and decided to go into the water. Most of the group was already in bathing suits, but René was not, so he changed on the beach with Bilgic holding up a towel to shield him from the group. Plaintiff says that the wind blew the towel out of the way and René was exposed to the group while naked. Bilgic denies that the towel was blown completely out of the way, although she acknowledges that a corner may have been blown aside. With respect to both incidents, Plaintiff does not claim that René intentionally exposed himself, although she believes he could have taken more precautions by avoiding public nudity in the first place.

### C. Return to United States and Termination

Plaintiff returned to the United States on September 10, but Bilgic remained in Spain until September 19. During this time, Plaintiff filed weekly work-related e-mail updates with Bilgic, but did not reference her relationship with Marcel. Meanwhile, Marcel and Plaintiff

remained in contact via text message and frequently discussed the future of their relationship. Marcel encouraged Plaintiff to talk to Bilgic about the situation, but Plaintiff resisted and indicated that it was too soon to bring it up and that doing so would "show that we didn't listen to them."

Plaintiff and Bilgic had a regularly scheduled telephone conference planned for September 26, but Bilgic cancelled it due to a conflict. Meanwhile, Bilgic had been speaking extensively with René, Gudrun, and two other IKA Werke employees about Plaintiff's situation. Through these conversations, she learned that Plaintiff and Marcel remained in touch. In light of this information, and after forceful input from Gudrun in favor of firing Plaintiff, Bilgic decided to terminate her employment. René approved of the decision, and on September 30, Bilgic called Plaintiff to inform her of her termination, effective October 1. During the call, Bilgic indicated that Plaintiff was fired because Bilgic could no longer trust her. Plaintiff responded, "I'm really sorry, I'm a bit shocked." Although Bilgic cited the lack of communication from Plaintiff as the ultimate reason for her termination, she also testified that engaging in a sexual relationship on a business trip, failure to immediately address this with her supervisor, continuing the relationship throughout the trip, failing to follow up with Bilgic upon her return to the United States, and continuing to stay in touch with Marcel after the trip ended all contributed to her decision to end Plaintiff's employment with IKA-Works.

## II.  LEGAL STANDARD

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). Material facts are those which "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). In deciding a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26). In making this showing of a genuine dispute, "the nonmovant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

### III.   DISCUSSION

Plaintiff has advanced two theories of discrimination.  First, she has claims that her termination constituted disparate treatment based on sex.  Second, she argues that several events during the sailing trip – the initiation of the relationship by Marcel, René exposing himself to her, René photographing her reclining on the deck of the boat, and René berating her about the relationship – created a hostile work environment motivated by sex.

#### A.  Disparate Treatment

Disparate treatment claims that are, like Plaintiff's, based on indirect evidence of discrimination are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Burton v. Teleflex, Inc.*, 707 F.3d 417, 425-26 (3d Cir. 2013) (applying *McDonnell Douglas* framework to Title VII sex discrimination claim); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (holding that the PHRA is generally interpreted in accord with analogous federal law).  Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Burton*, 707 F.3d at 426.  If a *prima facie* case is established, the burden of production shifts to the defendant to present a legitimate, non-discriminatory reason for its actions.  *Id.*  If such a reason is proffered, the burden shifts back to the plaintiff to demonstrate "that the employer's proffered justification is merely a pretext for discrimination."  *Id.*

##### 1.  *Prima facie* case

To establish a *prima facie* case of sex discrimination under Title VII or the PHRA, a plaintiff must show that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably or that the adverse employment action occurred under

10

circumstances that could give rise to an inference of intentional discrimination. *Burton*, 707 F.3d at 426 (3d Cir. 2013).[5]

In this case, the first three elements of Plaintiff's *prima facie* case are not disputed: she is female, she was qualified for her position, and her termination was an adverse action. Defendant argues, however, that Plaintiff has not offered sufficient evidence to support the fourth element: an inference of discrimination with respect to her termination. The most straightforward method for demonstrating an inference of discrimination is to show that "similarly situated" employees who were not in a protected class were treated more favorably. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999). But it is possible to establish a *prima facie* case without specific comparators if a plaintiff can provide other evidence to "establish some causal nexus between [her] membership in a protected class and the [adverse action.]" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). The "'central focus'" of this inquiry "'is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Pivirotto*, 191 F.3d at 352 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Setting aside whether Marcel is a valid comparator, Plaintiff has identified evidence to show a causal nexus between her sex and Defendant's decision to fire her: René Stiegelmann's conversation with her on the final day of the sailing trip. Plaintiff claims that René called her a "whore" and expressed disbelief that she could "let" Marcel have sex with her, and it is undisputed that he asked Plaintiff how she could "open her legs" so soon after meeting someone. All three of these comments included gendered references to sexual activity and suggest that René considered a woman's role in a sexual relationship to be different from a man's. René's

---

[5] The Third Circuit has held that the *prima facie* aspect of a PHRA claim is analyzed in accord with analogous federal discrimination law. *See Kelly*, 94 F.3d at 105.

statement that Plaintiff's behavior was inappropriate for a "business*woman*" suggests that René – the ultimate decisionmaker for all IKA companies – viewed female sexual activity as more problematic from an employer's perspective than similar behavior on the part of a male employee.  Finally, René's warning that Plaintiff could not sleep with Marcel as a route into the Stiegelmann family and his concern that Plaintiff had asked about Marcel's future with IKA provide further evidence that René harbored "traditional stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior."  *Spain v. Gallegos*, 26 F.3d 439, 448 (3d Cir. 1994).  Even though René did not make the final decision to fire Plaintiff himself, he approved the decision and Bilgic's testimony confirms that René played a significant role in the discussions about Plaintiff's future with the company.  A jury could therefore reasonably conclude that his reaction to Plaintiff's relationship with Marcel provides evidence that Plaintiff's termination was based on her sex.  Plaintiff has thus made out a *prima facie* case of disparate treatment sex discrimination.

### a. Legitimate non-discriminatory reason

Defendant's burden when offering a legitimate non-discriminatory reason is "relatively light," and requires only that the employer "provide[] evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  *Burton*, 707 F.3d at 426.  Defendant reasons that Plaintiff was fired because of the combination of her "inappropriate" relationship with Marcel, the failure to proactively address the relationship with Bilgic, continuing the relationship after vowing to end it, and failing to follow up with Bilgic after returning to the United States.  Ultimately, Bilgic contends that she could no longer trust Plaintiff with the responsibilities of her sales position.  Defendant has thus met its burden to articulate a legitimate non-discriminatory reason for firing Plaintiff.

### b. Pretext

To prevent summary judgment when the defendant has responded with a legitimate, non-discriminatory reason for its action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). When a plaintiff attempts to show pretext by demonstrating the weakness of an employer's proffered reasons, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (internal citations omitted). It is not enough for a plaintiff to "simply show that the employer's decision was wrong or mistaken," but instead the "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (internal quotation marks and citations omitted).

Plaintiff has identified several weaknesses in Defendant's proffered reason for terminating her. First, the proffered reason itself is vague and imprecise. Although Bilgic ultimately emphasized that lack of trust was the driving factor behind the decision, she also mentioned the relationship itself as partial motivation and was unable to articulate exactly when the decision was made. Second, Plaintiff contends that Bilgic was initially enthusiastic – and then perhaps neutral – in her attitude toward the relationship. This suggests a contradiction with

13

Bilgic's claim that the termination was based partly on the "inappropriate" nature of the relationship. Third, it was Bilgic who cancelled her only scheduled call with Plaintiff between the time Bilgic returned to the United States and Plaintiff's termination approximately ten days later, which weakens Bilgic's contention that Plaintiff failed to adequately address the situation after returning to the United States. Fourth, Plaintiff claims that Bilgic told her in Majorca that the relationship would not impact her employment status at IKA-Works, and that she would be judged on her sales performance alone, which again contradicts Bilgic's reference to any behavior on the trip as a basis for termination. Fifth, Marcel continued to tell his family about his ongoing communication with Plaintiff, so the fact that Plaintiff and Marcel remained in touch was not hidden from Bilgic (nor is there evidence that Plaintiff was ever told to stop contacting Marcel), which weakens Bilgic's contention that Plaintiff's lack of proactive communication was dishonest or insubordinate. Taken together, these inconsistencies, contradictions, and weaknesses are sufficient to permit a factfinder to disbelieve Defendant's articulated non-discriminatory explanation and make a reasonable inference that Plaintiff's termination was instead motivated by discrimination. Defendant's motion for summary judgment shall therefore be denied with respect to Plaintiff's disparate treatment claim.

  B. **Hostile Work Environment**

  Plaintiff contends that Marcel's initial proposition of sex, René's comments to her on the final day of the trip, René taking a photograph "up her shorts," and René's exposing himself to her on two occasions created a hostile work environment. To prevail on a hostile work environment claim arising from sexual harassment, the plaintiff must show that: 1) she suffered intentional discrimination because of her sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally

affect a reasonable person in like circumstances; and, 5) the existence of *respondeat superior* liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

### 1. Intentional Discrimination

Turning to the first element of a hostile work environment claim, a plaintiff need not bring forward direct evidence of intentional discrimination. *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001). Rather, indirect evidence is sufficient, and the Third Circuit has noted that "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990). Furthermore, the "intent" element of a hostile work environment claim refers only to whether the behavior was intentionally based on a protected status, not on whether the alleged harasser intended hostility or abuse. *Abramson*, 260 F.3d at 278.

Defendant has argued that the hostile work environment inquiry in this case should be limited to René's remarks to Plaintiff on the final day of the retreat, and should not include René's nudity, René's photograph of Plaintiff, or Marcel's initial proposition of sexual activity. Defendant's argument is suffices with respect to René's nudity. The first incident – which occurred when Plaintiff walked below the deck of the boat and saw René toweling himself off after a shower – was undisputedly unintentional. The showers opened into the common area, René was alone in that area when he exited the shower, and Plaintiff conceded that René did not intentionally expose himself to her. The second incident – which occurred when René changed into a bathing suit on a public beach guarded only by a towel – also falls short of intentional discrimination. While changing clothes on a public beach during a company-sponsored trip may exhibit poor judgment, there is no evidence that René intended to expose himself to the group or

15

specifically to Plaintiff. René's nudity, therefore, cannot serve as the foundation for a hostile work environment claim. Turning next to the photograph, whether it can be perceived as intentional discrimination is a close call. While Plaintiff is fully clothed and the photograph is taken from the angle of a person standing near Plaintiff, the fact that the photo provides a view "up [Plaintiff's] shorts" could allow a reasonably jury to conclude that the photograph was an intentional act based on Plaintiff's sex.

Turning to Marcel's behavior: his proposition of sexual activity to Plaintiff and René's easily satisfies the "intentional discrimination" element of a hostile work environment claim. While the sexual relationship between Plaintiff and Marcel was eventually consensual, it is undisputed that Plaintiff rejected Marcel's initial sexual advances on board the boat and a jury could reasonably conclude that a sexual proposition from a part-owner of Defendant's parent company (and the son of Plaintiff's supervisor's lover and boss) constitutes intentional sex discrimination. Thus, the hostile work environment inquiry in this case requires consideration of not only René's conversation with Plaintiff on the final day of the trip, but also both Marcel's initial sexual proposition and René's photograph of Plaintiff.

### 2. Severity or Pervasiveness

Turning to the second element of a hostile work environment claim, the ultimate inquiry is whether the harassment was "sufficiently severe or pervasive [as to] alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted). In making this inquiry, a court must consider the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). While a hostile work environment claim typically involves a pervasive pattern of abuse, a claim can arise from isolated incidents when those incidents are "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). This analysis "must concentrate not on individual incidents, but on the overall scenario." *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005).

Viewing the overall scenario experienced by Plaintiff on the sailing trip, a jury could reasonably conclude that she was subjected to sexual harassment sufficiently severe to alter her conditions of employment. Plaintiff was invited on a twelve-day sailing trip less than six months into her employment with a family-owned company. Within the first days of that trip, Plaintiff was propositioned for sex by a part-owner of the company (who she had never previously met), and the trip concluded with her being berated for accepting that proposition by his father who was the president of the company. This scenario represents an intermingling of sex-based discrimination and employment conditions. Indeed, Plaintiff testified that she felt that she was "damned if I do, damned if I don't" in relation to Marcel's initial proposition for sex, particularly in light of René's history of engaging in relationships with female employees, including Bilgic. The fact that a consensual relationship eventually emerged between Marcel and Plaintiff does not mitigate the severity of the initial proposition as an instance of sexual harassment. The trip then concluded with René's reprimanding Plaintiff in sexually derogatory language, including the undisputed disparaging of her for "opening her legs" too quickly, along with an explicit threat to her employment based on her sexual relationship with Marcel. Taken in the context of a twelve-day company sponsored trip in which Plaintiff had little contact with the outside world, a jury could reasonably conclude that this environment, though brief, was sufficiently severe as to constitute a change in the conditions of Plaintiff's employment.

### 3. Detrimental Effect

As the Supreme Court has noted, whether harassment is both objectively detrimental to the reasonable employee and subjectively detrimental to a plaintiff herself is not "a mathematically precise test." *Harris*, 510 U.S. at 22.  Instead, a court must look at all circumstances to determine if "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Id.*  Evaluating the objective detrimental effect of the harassment requires judging the situation "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (internal quotation marks omitted).  This inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.*

In cases such as this in which a hostile work environment claim is based primarily on the severity of conduct rather than its pervasiveness, the objective detrimental effect prong aligns with the severity prong.  In other words, if conduct is so severe that it alters the conditions of employment despite a lack of pervasiveness, then it follows that it is objectively detrimental to a reasonable employee.  That is the case here.  For the same reasons that a jury could find that the described conduct was sufficiently severe to alter the conditions of Plaintiff's employment, it could find that the conduct would detrimentally affect a reasonable similarly situated employee.

Turning to whether the claimed harassment detrimentally impacted Plaintiff herself, the record is clear.  The text messages between her and Marcel reveal her anxiety about the entire situation and how it might impact her future with IKA-Works.  Her visibly traumatized reaction to conversation with René on the patio, and her subsequent concern that she would be fired is direct evidence that she was detrimentally impacted.  And her reluctance to reach out to Bilgic to discuss her relationship with Marcel due to her fear of retribution shows that the detrimental

effect endured beyond the trip.  A jury could therefore reasonably conclude that Plaintiff subjectively experienced a detrimental effect as a result of the alleged hostile work environment.

### 4. *Respondeat Superior* Liability

When a hostile work environment claim is based on alleged harassment by a supervisor, an employer's liability is established if the harassment culminates in a tangible employment action.  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  When the alleged harasser is not a supervisor, the employer is liable "only if it was negligent in controlling working conditions."  *Id*.

Since the alleged harassment in this case culminated in an adverse employment action – Plaintiff's termination – liability for harassment by René can be imputed to IKA-Works because he was the President and part-owner of IKA-Works's parent company, and undisputedly had authority over all IKA-Works matters.  With respect to alleged harassment carried out by Marcel, even if he was not acting as a supervisor, a jury could reasonably find that IKA-Works was negligent given that the entire twelve-day sailing trip happened in the immediate presence of Plaintiff's direct supervisor and that Marcel, René, and Bilgic were in close communication throughout the trip.  In sum, Plaintiff has provided evidence from which a jury could reasonably conclude that all five elements of a hostile work environment claim have been met, and Defendant's motion for summary judgment shall be denied with respect to that claim.

An order follows.

**Dated:**  December 16, 2016

                                              **BY THE COURT:**

                                              **/S/WENDY BEETLESTONE, J.**

                                              _____

                                              **WENDY BEETLESTONE, J.**

...